AMY KARLIN (Bar No. 150016)
Interim Federal Public Defender
Diana Sánchez (Bar No. 338871)
(E-Mail: Diana_Sanchez@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-1891
Facsimile: (213) 894-0081

Attorneys for Petitioner
Humberto Negrete Bravo

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

HUMBERTO NEGRETE BRAVO,

*Petitioner*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; TODD BLANCHE, in his official capacity as Attorney General; ERNESTO SANTACRUZ, in his official capacity as Los Angeles Field Office Director, U.S. Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; FERETI SEMAIA, Warden, Geo Group Inc., Adelanto Detention ICE Processing Center

*Respondents*.

Case No.

**VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

# TABLE OF CONTENTS


Page

INTRODUCTION ..... 1

PARTIES ..... 2

JURISDICTION AND VENUE ..... 3

EXHAUSTION ..... 4

FACTUAL BACKGROUND ..... 13

LEGAL ARGUMENT AND CLAIMS FOR RELIEF ..... 17

- I. Because Petitioner's detention is not authorized by the Immigration and Nationality Act, it is unlawful and he must be released. ..... 17
- II. The bond proceedings before the Immigration Judge were legally deficient and provide independent grounds for release. ..... 20
  - A. The Immigration Judge failed to consider alternatives to detention. ..... 21
  - B. The IJ abused her discretion by relying on Petitioner's unlawful status. ..... 23
  - C. The IJ's determination that Petitioner was a flight risk based on not paying taxes for two years is also an abuse of discretion. ..... 24
  - D. The IJ legally erred and violated due process by relying on the fabricated Form I-213. ..... 25
  - E. The IJ failed to hold DHS to its burden of proving Petitioner's detention is justified by clear and convincing evidence. ..... 29
  - F. The IJ abused her discretion and violated due process because she relied on allegations of conduct for which the federal government dismissed the charge. ..... 31
  - G. The IJ misstated the record and ignored relevant evidence, constituting a further abuse of discretion and denial of due process. ..... 32
  - H. Petitioner was and will continue to be denied a neutral arbiter. ..... 33

PRAYER FOR RELIEF ..... 43

VERIFICATION PURSUANT TO 28 U.S.C. § 2242 & L.R. 83-16.2 ..... 45

# INTRODUCTION

1. Petitioner Humberto Negrete Bravo ("Petitioner" or "Mr. Negrete") is an agricultural worker and father to four United States citizen children who has spent the past twenty-five years building deep roots in the Coachella Valley. He has no criminal history, has consistently filed his taxes, and is seeking relief from removal. Respondents have unlawfully detained Petitioner for over ten months.

2. Petitioner's detention grew out of a mistaken-identity encounter with plainclothes officers in December 2025. The federal criminal complaint that followed was dismissed at the government's own request, and the government asked that he be released forthwith. Respondents instead took him into ICE custody, with no warrant and no custody determination, and have held him ever since.

3. Petitioner's detention is unlawful for two independent reasons, and each one requires his release.

4. First, Petitioner's detention is unlawful as it is not authorized by any statutory authority under the Immigration and Nationality Act ("INA"). Under *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160 (9th Cir. 2026), 8 U.S.C. § 1225(b)(2)(A) cannot govern it. 8 U.S.C. § 1226(a) cannot authorize it either, because Respondents never obtained a warrant or made the initial custody determination that statute requires.

5. Second, the IJ's decision denying Petitioner bond was a denial of due process and was an abuse of discretion. On July 24, 2026, an Immigration Judge ("IJ") held a custody redetermination hearing under the *Rodriguez* injunction where DHS had the burden to prove by clear and convincing evidence that Petitioner's detention was justified. DHS's only evidence was an unsigned, falsely backdated Form I-213. The IJ nonetheless denied bond, finding Petitioner a flight risk. She rested that finding on the unauthenticated and unreliable allegations from the backdated Form I-213 and dismissed criminal charge, on his entries without inspection two decades ago, and on a misstatement of his tax history. She never addressed alternatives to detention or the

substantial evidence of his ties to the community. The bond proceedings also lacked the neutral decisionmaker due process requires, given the systemic restructuring of the Executive Office for Immigration Review.

6. Petitioner asks this Court to issue a writ of habeas corpus declaring his detention unlawful and ordering his immediate release without restraints on his liberty. To preserve the Court's jurisdiction, he also asks the Court to bar Respondents from transferring him out of this District or removing him while this case is pending.

## PARTIES

7. Petitioner Humberto Negrete Bravo is a long-term resident of California and dedicated agricultural worker with no criminal history, seeking cancellation of removal in his immigration proceedings based on his four United States citizen children. He was arrested by ICE officers on December 23, 2025, and has been unlawfully detained by Respondents at the Adelanto ICE Processing Center (or “Adelanto Detention Facility”) since January 7, 2026.

8. Respondent Markwayne Mullin is the Secretary of the Department of Homeland Security (“DHS”). As the head of DHS, he is responsible for the administration of the immigration laws, pursuant to 8 U.S.C. § 1103(a); he routinely transacts business in the Central District of California; he supervises Respondents Santacruz and Lyons; and he is responsible for the pursuit of Petitioner’s detention and removal. As such, he is Petitioner’s ultimate legal custodian. Respondent Mullin is sued in his official capacity.

9. Respondent Ernesto Santacruz is the ICE Los Angeles Field Office Director and is responsible for the administration of immigration laws and the execution of immigration enforcement and detention policy within the Los Angeles Area of Responsibility, which spans the seven counties that overlap with the Central District of California. Petitioner is currently detained within this area of responsibility. Respondent Santacruz maintains an office and regularly conducts business in this

district. As such, Respondent Santacruz is a legal custodian of Petitioner. He is named in his official capacity.

10. Respondent Todd Wallace Blanche is sued in his official capacity as the Acting Attorney General of the United States. As Acting Attorney General, Respondent Blanche oversees the Department of Justice and immigration court system, including the immigration judges who conduct removal proceedings and bond hearings as his designees. He is also responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103(g). He is legally responsible for administering Petitioner's removal and bond proceedings, and as such, he is a legal custodian of Petitioner. Respondent Blanche is sued in his official capacity.

11. Respondent Todd Lyons is the Senior Official Performing the Duties of the Director of ICE. In that capacity, he is a legal custodian of Petitioner. Respondent Lyons is sued in his official capacity.

12. Respondent Warden is the warden and facility administrator of the Adelanto ICE Processing Center and Detention Facility, a private, for-profit detention facility, that contracts with ICE to detain individuals suspected of civil immigration violations. Respondent is the immediate physical custodian of Petitioner and is named in his official capacity.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction to entertain this habeas petition under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201-02 (Declaratory Judgment Act), 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (the Suspension Clause), and the Due Process Clause of the Fifth Amendment.

14. Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(a) and 28 U.S.C. § 1391(b)(2) and (e)(1) because Petitioner is physically detained within this district, Petitioner's immediate physical custodian is in this district,

at least one Respondent is in this district, and a substantial part of the events giving rise to the claims in this action took place in this district.

**EXHAUSTION**

15. No statutory exhaustion requirement applies to a § 2241 petition challenging the lawfulness or constitutionality of immigration detention. Thus, Petitioner's claims are only subject to prudential exhaustion. *See Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017). Courts "have discretion to waive a prudential requirement." *Laing v. Ashcroft*, 370 F.3d 994, 998 (9th Cir. 2004).

16. As a threshold matter, "[d]istrict courts have the authority to review compliance with prior orders granting habeas relief, including orders for bond hearings." *Bayani v. LaRose*, No. 26-CV-266-JESVET, 2026 WL 1270059, at *3 (S.D. Cal. May 8, 2026) (citing *Leonardo v. Crawford*, 646 F.3d 1157, 1161 (9th Cir. 2011)); *accord Diallo v. Casey*, No. 26-cv-2167-RSH-BLM, 2026 WL 1834391, at *2 (S.D. Cal. June 25, 2026) ("Irrespective of the prudential exhaustion doctrine, however, the Court retains jurisdiction to determine whether a party has complied with its earlier habeas order." (citing *Leonardo*, 646 F.3d at 1161)). Here, Petitioner had a bond hearing pursuant to the *Rodriguez* permanent injunction.

17. The three factors laid out in *Puga v. Chertoff*, 488 F.3d 812 (9th Cir. 2007), also weigh against imposing prudential exhaustion here. "[E]ven if the three *Puga* factors weigh in favor of prudential exhaustion," which they do not, "a court may waive the prudential exhaustion requirement if administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void.'" *Hernandez*, 872 F.3d at 988 (quoting *Laing*, 370 F.3d at 1000).

18. The first *Puga* factor asks if "agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision." 448 F.3d at 815. There are two overarching reasons why this factor weighs against prudential exhaustion.

19. For one, far from having expertise, the agency would not be able to adjudicate many of Petitioner's claims here. The Immigration Judge and Board of Immigration Appeals ("BIA") are housed within the Executive Office for Immigration Review ("EOIR"), a sub-agency of the Department of Justice--one of the various Respondents in this case. The IJ conducted a custody re-determination hearing where the IJ determined if Petitioner poses a danger or flight risk. *See* Exhibit 1 (IJ Decision). The BIA can only review that determination in a bond appeal. *See* 8 C.F.R. §§ 1003.1(b), (d)(3). As such, the IJ and BIA do not have the authority to rule on several of Petitioner's constitutional claims, including his challenges to the agency's procedures. *See, e.g.*, *Sola v. Holder*, 720 F.3d 1134, 1135 (9th Cir. 2013) (per curiam) ("An exception to the exhaustion requirement has been carved for constitutional challenges to the Immigration and Naturalization Act and [DHS] procedures."); *Padilla-Padilla v. Gonzales*, 463 F.3d 972, 977 (9th Cir. 2006) ("The BIA does not have jurisdiction to determine the constitutionality of the statutes it administers."); *Bagues-Valles v. I.N.S.*, 779 F.2d 483, 484 (9th Cir. 1985) ("The BIA, however, has no jurisdiction to adjudicate constitutional issues."). This includes: Respondents' failure to provide an initial custody determination and custody re-determination under § 1226(a); the IJ's failure to comply with the *Rodriguez* injunction and due process requirement that the IJ consider alternatives to detention; the IJ's failure to comply with the *Rodriguez* injunction and due process requirement that the government bears the burden of proof; and the denial of a neutral adjudicator in light of the IJ and BIA's systematic reshaping, policies, and practices, which make them unable to provide "the guarantee of an impartial and disinterested tribunal." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

20. For two, the *Puga* factor asks not simply whether the agency has expertise but whether the agency expertise "makes agency consideration necessary to generate a proper record and reach a proper decision." 488 F.3d at 815. The BIA, however, cannot generate any more of a record than what exists. The IJ's written decision, the audio and

transcript of the hearing, and the evidence before the IJ, are before this Court. The BIA would consider the same record and is incapable of generating any more of a record because the BIA cannot consider new evidence nor can the BIA engage in fact-finding. *See* 8 CFR § 1003.1(d)(3)(iv); EOIR Policy Manual, Part III - Board Practice Manual, 3.8, Evidence on Appeal, https://www.justice.gov/eoir/policy-manual-eoir/part-III/bia/chapter-3-8 ("The Board considers only that evidence that was admitted in the proceedings below."); *id.* ("The Board does not consider new evidence on appeal."). Thus, "the legal issues presented here do not require BIA expertise and do not require further development of the record." *Espinoza v. Warden of Adelanto ICE Processing Ctr.*, No. 5:26-cv-02936-MAR, 2026 U.S. Dist. LEXIS 171196, at *14 (C.D. Cal. July 27, 2026) (citing *Fuentes v. Mullin*, 2026 U.S. Dist. LEXIS 144010, 2026 WL 1847436, *6-7 (C.D. Ca. June 25, 2026) (BIA did not have expertise in legal question and evaluating whether non-citizen received legally and constitutionally adequate bond hearing).

21. The second *Puga* factor also weighs against exhaustion because Petitioner is not deliberately bypassing a BIA appeal but rather is pursuing a BIA appeal and federal habeas review. *See* Exhibit 2, Declaration of Humberto Negrete Bravo, ¶¶ 8; Exhibit 4 (Confirmation of Appeal). However, for the reasons described above and below, a BIA appeal would not result in an adequate remedy and would be a futile gesture. Moreover, Petitioner's individual financial circumstances mean he does not have the means to pay the legal representation fees to pursue a BIA appeal. *See* Negrete Bravo Decl., ¶ 10.

22. The third *Puga* factor weighs heavily against exhaustion because a BIA appeal is not likely to correct the agency's mistakes or preclude judicial review. To start, as explained above, several of the legal errors raised here cannot be adjudicated by the BIA at all. Even for the claims that the BIA can review, as explained below, the BIA will almost certainly reject Petitioner's appeal.

23. As a threshold matter, EOIR continues to apply its policy that Petitioner is not entitled to bond at all and that the IJ lacks jurisdiction to grant him bond, per *Matter of Yajure-Hurtado*, 29 I. & N. Dec. 216 (BIA 2025). *See infra* at ¶ 26. As such, the BIA would almost certainly deny any appeal as they would consider him not entitled to bond at all. Even if it did not apply its policy under *Yajure-Hurtado*, the evidence below demonstrates that the almost certain result is that Petitioner's bond appeal will be denied. Thus, "administrative review would not preclude the need for judicial review, because [Petitioner] would undoubtedly seek" federal habeas review, through counsel, of the agency's decision. *See Singh v. Holder*, 638 F.3d 1196, 1203 n.3 (9th Cir. 2011) (holding exhaustion did not apply). Exhaustion would therefore neither correct the agency's mistakes nor preclude judicial review.

24. For the reasons above, the *Puga* factors weigh against prudential exhaustion here. Even if they did not, the Court should waive any prudential exhaustion requirement because the administrative remedy, a BIA appeal, is inadequate, would be a futile gesture, and would be void. All the while, Petitioner will continue to suffer irreparable harm. *See Hernandez*, 872 F.3d at 988; *Laing*, 370 F.3d at 1000.

25. A BIA appeal is an inadequate and futile process. As explained above, the BIA appeal cannot adjudicate several of Petitioner's challenges to his detention pursuant to that custody re-determination hearing. Even for the claims that the BIA can adjudicate, additional reasons make it very likely that Petitioner's appeal will result in a futile and ineffective process.

26. As explained, the BIA's decision in *Yajure-Hurtado* holds that Petitioner, is "seeking admission" under the BIA's interpretation, and therefore must "be subject to mandatory detention for the duration of their immigration proceedings" under § 1225(b)(2). *See* 29 I & N. Dec. 216 at 220-25. Although the Ninth Circuit has rejected Respondents' interpretation of § 1225(b)(2)(A) in *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160 (9th Cir. 2026), Respondents still "do not defend their noncompliance with the *Maldonado Bautista* judgment, nor does it appear that they have taken remedial

steps to conform their conduct now that *Rodriguez Bostock* has confirmed that their policy violated the law." *Dominguez v. Janecka*, No. 5:26-CV-04540-BFM, 2026 WL 2574835, at *4 (C.D. Cal. Aug. 31, 2026); *see also Perez v. Acting Warden of the Adelanto Det. Ctr.*, No. 5:26-cv-03936-MBK, 2026 U.S. Dist. LEXIS 169992, at *10-12 (C.D. Cal. July 30, 2026) (describing Respondents' continued non-compliance with federal court orders); *Gonzalez v. Santacruz*, No. 2:26-CV-08978-DSR, 2026 WL 2675864, at *1 (C.D. Cal. Sept. 11, 2026) (describing Respondents' similar non-compliance with *Rodriguez Vazquez*). Respondents' policies and abdication of court orders is further discussed below.

27. As further discussed below, the structural transformation of EOIR and systematic bias is demonstrated with respect to the BIA through: (1) the mass purging of BIA members; (2) the statistical evidence behind its decision making; and (3) the timing and nature of its decisions. The current administration purged BIA members from twenty-six to nine permanent members and six temporary members,[1] including all members who were appointed under the prior administration.[2] *See also* 90 FR 15525. This paved the path for a smaller majority to publish decisions and highlighted the agency's lack of independence.

28. Between January 20, 2025 and March 6, 2026, the reconstituted BIA issued 81 published decisions.[3] Most critically, in bond appeals, all decisions ruled against the noncitizen, including several that reversed grants of bond and called for re-

---

[1] *See* Catholic Legal Immigration Network, Inc., "Precedent or Policy? A Quiet Transformation of the Board of Immigration Appeals" (Aug. 22, 2025), https://www.cliniclegal.org/resources/precedent-or-policy-quiet-transformation-board-immigration-appeals.

[2] Cassler, Rebecca, "BIA Decision Strips Immigration Judges of Bond Authority, All but Guarantees Mandatory Detention for Undocumented Immigrants," American Immigration Council (Sept. 12, 2025), https://www.americanimmigrationcouncil.org/blog/bia-ruling-immigration-judges-bond-mandatory-detention-undocumented-immigrants/.

[3] *See* U.S. DOJ, Executive Office for Immigration Review, *BIA Precedent Decisions, Vol. 29*, online at https://www.justice.gov/eoir/volume-29 (last accessed Feb. 13, 2026).

detention. All but two of all BIA decisions in this time period were decided against the noncitizen, resulting in a 97% pro-government rate.[4] The two other decisions did not result in a favorable decision for the noncitizen.[5] By contrast, the prior administration issued 76 published decisions, 60% of which favored the government.[6]

29. Moreover, of the 39 BIA decisions reviewing an Adelanto Immigration Court bond denial in May through August 2025, *none* of those decisions overturned an immigration judge's finding that the noncitizen was a danger or a flight risk.[7] Of the six decisions which sustained the appeal and remanded the case, all were due to procedural errors made by the immigration judge.

30. The targeted firing of BIA judges who do not consistently rule in the administration's favor does not merely produce bias at the appellate level — it constrains IJs from the outset, as any decision running afoul of BIA precedent will almost certainly be reversed. And even where no binding precedent compels a different result, DHS routinely appeals favorable IJ decisions, knowing a compliant BIA is likely to reverse. Though bias need not compromise every case, "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872 (2009) (citation omitted).

---

[4] Ximena Bustillo, Rahul Mukherjee, "An Immigration Court Few Have Heard of is Quietly Shaping Policy Behind the Scenes," npr.org (Mar. 20, 2026) https://www.npr.org/2026/03/20/nx-s1-5707535/trump-immigration-detention-appeals-board-deportation.

[5] One decision purportedly in favor of the noncitizen described the methods in which an IJ can pretermit an application for relief prior to an evidentiary hearing, and remanded the case for the IJ to follow that method. *See Matter of C-A-R-R-*, 29 I&N Dec. 13 (BIA 2025). The other decision did not involve a noncitizen, but a disciplinary proceedings against an attorney. *See Matter of Landers*, 29 I&N Dec. 240 (BIA 2025).

[6] Exec. Off. for Immigr. Rev., Volume 28, U.S. Dep't of Just. (June 13, 2025), https://www.justice.gov/eoir/volume-28. *See also The BIA and AG's Systemic Destruction of Noncitizens' Rights in Removal Proceedings*, National Immigration Project, February 19, 2026, https://nipnlg.org/work/resources/bia-and-ags-systemic-destruction-noncitizens-rights-removal-proceedings.

[7] The decisions are posted at EOIR Freedom of Information Act (FOIA) Reading Room at https://foia.eoir.justice.gov/app/ReadingRoom.aspx. They are not available after August of 2025.

31. The BIA's perfect record for DHS in precedential opinions has had a particularly stark impact on detention. In addition to the *Yajure-Hurtado* decision, several other BIA decisions have reversed IJ bond grants, dramatically expanding the government's ability to detain noncitizens without scrutiny. *See, e.g.*, *Matter of Akhmedov*, 29 I&N Dec. 166, 167-68 (BIA 2025) (vacating bond grant and holding that no bond amount could mitigate flight risk based on inconsistent address history); *Matter of C-M-M-*, 29 I&N Dec. 141, 144 (BIA 2025) (vacating bond grant and holding prior removal and illegal reentry categorically establishes flight risk); *Matter of Choc-Tut*, 29 I&N Dec. 48, 51 (BIA 2025) (ordering detention without bond notwithstanding state court's finding that noncitizen posed no danger).

32. On February 6, 2026, EOIR published an interim final rule (effective March 9, 2026) radically restructuring BIA appeals. Appellate Procedures for the Board of Immigration Appeals, 91 Fed. Reg. 5,267, 5,270 (Feb. 6, 2026). The rule represents the most significant change to immigration appeals in decades. The rule will shorten the appeal period from 30 days to 10 calendar days to file an appeal, with some limited inapplicable exceptions. This change causes a multitude of disparate impacts on noncitizens seeking relief from removal including dramatically compressed time to secure counsel; increased risk of missed deadlines, especially for detained individuals; lack of flexibility for mail delays or calendar errors; and the fact that appeals must be received by BIA within 10 days (not just postmarked).

33. The rule will also make automatic summary dismissal the default resolution. The current rule is that BIA reviews appeals on the merits unless affirmance without opinion is appropriate. The proposed new rule requires that the default is automatic dismissal within 15 days, unless the majority of permanent BIA members vote to accept the case en banc. This process would look like the following: appeal is filed; within 10 days, permanent BIA members vote whether to accept; if no majority vote to accept, automatic dismissal within 15 days; and IJ decision becomes final agency decision for judicial review. This will obviously also cause disparate and

prejudicial impact to noncitizens seeking appeal including the fact that most appeals will receive no substantive review, full Board consideration will be the rare exception rather than norm, the elimination of three-judge panels, and the de facto elimination of BIA as meaningful appellate body.

34. For the rare cases accepted for review, there will be a 20-day simultaneous briefing period rather than the current briefing period, which varies, and there will be no reply briefs. This is especially problematic in instances where DHS appeals a grant of relief, and the non-citizen has no opportunity to respond on appeal. Furthermore, the new rules will allow extensions only for exceptional circumstances. The new rule also eliminates IJ transcript review, limiting BIA's ability to identify errors in IJ proceedings. This is extremely problematic as it eliminates one of the very few safeguards in place to ensure immigration court proceedings are fair and constitutional.

35. Indeed, the proposed rule will undermine many of the reasons that some courts have imposed exhaustion, such as the need for record development or to receive a decision from the BIA.[8]

36. Given the evidence on this current administration's adjudication of appeals, it is very likely that the result of a BIA appeal would be futile for Petitioner and thus should not be required. *See Hernandez*, 872 F.3d at 989 ("[W]here . . . it is 'very likely' what the result of recourse to administrative remedies would be, such recourse would be futile and is not required." (citation omitted)).

37. The administrative appeal process is also inadequate because Petitioner will be forced to wait months, if not over a year, for the BIA to decide his appeal. A recent analysis found that the mean processing time for detained BIA appeals is nearly a year: 314 days. *See* Exhibit 10 (Declaration of Zabdi J. Salazar), ¶ 9.

---

[8] The proposed rule has been challenged in *Amica Center for Immigrant Rights v. EOIR*, No. 1:26-cv-00696 (D.D.C.). The matter is currently stayed pending the completion of a notice and comment period and promulgation of the final rule. Dkt. 45, Order, *Amica Center for Immigrant Rights v. EOIR*, No. 1:26-cv-00696 (D.D.C. Apr. 10, 2026).

38. Petitioner's evidence demonstrating EOIR's systematic bias further supports waiving exhaustion. *See infra* at ¶¶ 103-122. Because the BIA is not able to provide a neutral adjudication, that process would also be void. *See Hernandez*, 872 F.3d at 988.

39. Yet another reason exhaustion should be waived is because Petitioner has been and will continue to suffer irreparable harm while detained at the Adelanto ICE Processing Center. The Ninth Circuit and this Court have recognized that immigration detention, including the "subpar medical and psychiatric care in ICE detention facilities," and "the economic burdens imposed on detainees and their families as a result of detention," results in "irreparable harms." *Hernandez*, 872 F.3d at 995; *Gomez v. Noem*, No. ED CV 25-3623-JFW(RAO), 2026 U.S. Dist. LEXIS 25295, at *13 (C.D. Cal. Jan. 30, 2026) (cleaned up and citations omitted).

40. Petitioner is experiencing a negative impact on his health and worsening medical conditions due to the inadequate medical and dental care at Adelanto. *See* Negrete Bravo Decl., ¶¶ 3-5. Petitioner's experience is consistent with the well-reported and particularly inhumane conditions at Adelanto ICE Processing Center. Earlier this year, the California Attorney General reported the Adelanto ICE Processing Center where Petitioner is detained as having inhumane conditions, including inadequate medical care, lack of medical care follow-ups, unsafe food and water, and failure to provide basic necessities. *See, e.g.,* California Department of Justice, *Immigration Detention in California*, at 32-54, https://oag.ca.gov/system/files/media/immigration-detention-2026.pdf (June 2026); *Attorney General Bonta Sounds Alarm on Inhumane Conditions at Adelanto Detention Center*, Office of the Attorney General (Mar. 19, 2026), https://oag.ca.gov/news/press-releases/attorney-general-bonta-sounds-alarm-inhumane-conditions-adelanto-detention; *see also L.T v. ICE.*, No. 5:26-cv-00322, 2026 WL 2131142 (C.D. Cal. July 16, 2026).

41. Moreover, Petitioner and his family are also suffering economic and emotional harm caused by his detention which will continue while he is forced to await

any BIA appeal decision. *See* Negrete Bravo Decl., ¶¶ 6-7; *Doe #2 v. Noem*, 2025 WL 1208273, *10 (W.D. Wash. Apr. 25, 2025) (discussing emotional harm as irreparable harm).

42. The inordinate and indefinite delay in waiting for a BIA bond appeal decision, as compared to BIA appeal adjudication before 2025 and 2026, also creates irreparable harm that counsels in favor of waiving exhaustion. *See supra* at ¶ 37. The Supreme Court has recognized that courts should not require exhaustion where there is an "unreasonable or indefinite timeframe for administrative action." *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992). Exhaustion is thus not appropriate given that Petitioner "may suffer irreparable harm if unable to secure immediate judicial consideration of his claim." *McCarthy*, 503 U.S. at 147.

## **FACTUAL BACKGROUND**

43. Petitioner entered the United States in 2001 and has built deep ties over the past twenty-five years. He is married and has four children who are all United States citizens. He has lived with his family and had a stable residence over the past decades in Mecca, California. Petitioner has been a dedicated agricultural worker in the Coachella Valley for approximately two decades. He has also consistently filed his taxes. Petitioner has no criminal history. The government, through an IJ's bond decisions, has determined that he does not pose a danger to the community.

44. On December 23, 2025, Petitioner was mistakenly detained by immigration officers who were seeking to apprehend a different individual. The officers were not identifiable as law enforcement officers. He was arrested following this encounter. A criminal complaint was filed the same day. Dkt. 1, *United States v. Negrete Bravo*, 5:25-mj-00786 (C.D. Cal. Dec. 23, 2025). Petitioner made his initial appearance the following day and was ordered detained. The magistrate judge relied solely on allegations that were dismissed just twelve days later. *See* Declaration of Shannon Coit, ¶ 4. At that hearing, he did not enter a plea because no formal charging document, such as an indictment, had been filed. *Id.*, Dkt. 5; Fed. R. Crim. P. 5(d)(4).

The government then had fourteen days to either provide Petitioner with a preliminary hearing before a neutral magistrate; or present the case to a grand jury. *See id.*, Dkt. 6 (scheduling a preliminary hearing for January 7, 2026, and an arraignment for January 13, 2026); Fed. R. Crim. P. 5.1(c) (requiring a magistrate judge hold a preliminary hearing "no later than 14 days after the initial appearance if the defendant is in custody).

45. After the initial appearance, Petitioner sought reconsideration of the magistrate judge's detention order with the district court. On December 29, 2025, the district court approved the request and scheduled a bond hearing for January 6, 2026. Dkt. 12, *United States v. Negrete Bravo*, 5:25-mj-00786 (C.D. Cal. Dec. 29, 2025). But on January 5, 2026, one day before the bond hearing and two days before the scheduled preliminary hearing, the government filed a motion to dismiss the complaint. This was due to the government's lack of evidence against Petitioner. *See also* Coit Decl., ¶¶ 6-8. The government further requested that Petitioner "be released from custody forthwith." *Negrete Bravo*, 5:25-mj-00786, Dkt. 11-1. On January 6, 2026, the magistrate judge dismissed the complaint and ordered Petitioner released forthwith. *Id.*, Dkt. 13. Respondents then placed Petitioner in ICE custody, and he has since been detained at Adelanto Detention Facility. Petitioner has and continues to disputes the government's allegations regarding the encounter and his arrest on December 23, 2025.

46. After placing Petitioner in ICE custody, Respondents denied him any individualized review of his custody. Respondents did not issue or serve a warrant for his arrest. Nor did Respondents provide an initial custody determination. Instead, Respondents subjected Petitioner to mandatory detention under 8 U.S.C. § 1225(b)(2)(A). *See* Dkt. 12, Respondents' Response to Petition, *Negrete Bravo v. Secretary of Homeland Security*, No. 5:26-cv-01760, at *2 (C.D. Cal. Apr. 17, 2026); Exhibit 7 (DHS's Evidence for *Rodriguez* Bond Hearing, filed July 22, 2026) at 8-9.

47. On April 9, 2026, Petitioner filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2241. *See Negrete Bravo v. Secretary of Homeland Security*,

No. 5:26-cv-01760 (C.D. Cal. 2026). On May 26, 2026, Judge Walter issued a judgment granting Petitioner's petition in part and ordering Respondents to hold an individualized bond hearing before an immigration judge under 8 U.S.C. § 1226(a) within seven days.

48. On June 2, 2026, Immigration Judge Patrick Barett held a bond hearing. in those proceedings, DHS filed a Form I-213 that was prepared and signed on January 7, 2026. *See* Exhibit 7 (Form I-213 dated Jan. 7, 2026) ("First Form I-213").[9] The IJ denied bond based on a determination that Petitioner failed to meet his burden that he is not a flight risk. Because the IJ denied bond based on flight risk, it is undisputed that Petitioner is not a danger to the community. *See, e.g.*, *Yan Lu v. Los Angeles Field Dir.*, No. 5:26-CV-00575-JAK (SPX), 2026 WL 1455320, at * 8 (C.D. Cal. Apr. 15, 2026).

49. On July 16, 2026, Petitioner filed a petition challenging his unlawful detention on several grounds, including the unlawful decision by IJ Barrett in challenging his bond proceedings. Dkt. 1, *Negrete Bravo v. Mullin*, No. 5:26-cv-3972 (C.D. Cal. 2026). Respondents opposed that petition solely on exhaustion grounds. *Id.*, Dkt. 9. On September 1, 2026, Judge Walter issued a judgment adopting the magistrate judge's Report and Recommendation, denying and dismissing counts I, II, and III, with prejudice, and denying and dismissing counts IV, V, and VI, without prejudice. *Id.*, Dkt. 18.

50. On July 24, 2026, after Petitioner filed his petition challenging his unlawful detention, including IJ Barrett's June 2 bond decision, Respondents provided Petitioner a bond hearing pursuant to the *Rodriguez* class wide injunction. *See* *Rodriguez v. Holder*, 2013 WL 5229795 (C.D. Cal. Aug. 6, 2013), *aff'd in part, rev'd in part Rodriguez v. Robbins (Rodriguez III)*, 804 F.3d 1060, 1089 (9th Cir. 2015), *rev'd sub nom. Jennings v. Rodriguez*, 583 U.S. 281 (2018). Under that injunction, DHS

---

[9] Petitioner presents this Form I-213 for the purpose of demonstrating what DHS filed in prior proceedings but does not concede its admissibility or any of the statements contained therein.

bore the burden of proving by clear and convincing evidence that Petitioner is a danger or flight risk such that detention is justified. The only evidence DHS filed in support of its position was a Form I-213. This Form I-213 (hereinafter "Second Form I-213"), unlike the Form I-213 (dated January 7, 2026) it had previously filed, had a date of December 23, 2025, and was not signed. *See* Exhibit 7. As described in detail below, this Form I-213 was backdated by Detention Officer Flores and had several other indicators that it was unreliable and inaccurate.

51. Petitioner submitted significant evidence in support of his position, including the birth certificates of his four United States citizen children, his tax returns from 2007 to 2023, information on his sponsor, and several letters of support demonstrating his ties to the community and good moral character. *See* Exhibit 5 (Petitioner's Evidence in Support of Bond); Exhibit 6 (Petitioner's Brief in Support of Bond).

52. At the bond hearing, after Petitioner was subject to cross-examination by DHS counsel and IJ Phan. After Petitioner's testimony and closing arguments, the IJ determined that Petitioner was a significant flight risk such that his request for custody redetermination was denied. *See* Exhibit 9 (Digital Audio Recording of Bond Hearing on July 24, 2026). The IJ's decision described the hearing as a "custody redetermination pursuant to 8 C.F.R. § 1236." Exhibit 1 (IJ Decision) at 1. The IJ concluded that Petitioner "is a significant flight risk such that no amount of bond or conditions would secure his future court appearances," without naming or discussing any alternative to detention. *Id.* The IJ based her conclusion on three reasons.

53. First, the IJ relied on Petitioner's "recent interactions with ICE officers," including the unreliable and unauthenticated allegations in the Second Form I-213. Without any explanation, the IJ discredited Petitioner's testimony and, instead, credited the unauthenticated Second Form I-213 and the hearsay statement from an unknown source. The IJ stated that Petitioner did not object to the admission of the Form I-213. However, the IJ disregarded that Petitioner disputed the allegations in the Forms I-213

in his testimony, and his counsel contested the Form I-213 allegations during closing argument as well. *See* Exhibit 9. Moreover, the IJ did not address the issues with the Second Form I-213, as demonstrated by the First Form I-213 DHS filed in the bond proceedings, despite the fact that DHS bore the burden of proof.

54. Second, the IJ relied on the fact that Petitioner has previously entered without inspection.

55. Third, the IJ incorrectly stated Petitioner "admitted to not paying taxes for the last two years." IJ Decision at 1. Although the IJ stated his explanation for not filing his income taxes "does absolve him from his federal income tax obligations," the IJ confusingly followed that by stating his "behavior demonstrates a disregard for this country's immigration laws." *Id.*

56. The IJ's decision never mentioned Petitioner's decades as an agricultural worker in the Coachella Valley, his four U.S. citizen children and other extended family with immigration status, his sponsor, the nearly two decades of tax returns he submitted, or any his supporting evidence. Instead, the IJ based her decision solely on her limited view of Petitioner's past behavior based on the unauthenticated and unreliable Form I-213, concluding that "[i]n light of [his] past behavior, should [he] be ordered removed, the Court is not confident that he would present himself for removal." IJ Decision at 1.

57. Petitioner reserved his right to appeal the IJ's decision denying him bond and has filed a timely appeal of that decision. *See* Exhibit 4.

58. Petitioner is presently applying for immigration relief, and his immigration proceedings remain pending before the Immigration Court.

## LEGAL ARGUMENT AND CLAIMS FOR RELIEF

### I. Because Petitioner's detention is not authorized by the Immigration and Nationality Act, it is unlawful and he must be released.

59. The Immigration and Nationality Act ("INA") authorizes detention pending the outcome of removal proceedings in two basic forms. First, 8 U.S.C. § 1226

"authorizes the Government to detain certain [noncitizens] already in the country pending the outcome of removal proceedings." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018).

60. Second, two provisions under 8 U.S.C. § 1225(b) provides for mandatory detention of certain noncitizens encountered "at the Nation's borders and ports of entry." *Jennings*, 583 U.S. at 288. The first provision applies to those who are subject to expedited removal for being apprehended upon arrival near the border or for being unable to show that they have been physically present in the United States for more than two years until a determination has been made as to whether they have a credible fear of persecution. 8 U.S.C. § 1225(b)(1). The second provision applies to an "applicant for admission" who is "seeking admission" and whom an "examining immigration officer determines . . . is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Under § 1225(b)(2)(A), a noncitizen "shall be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond a doubt entitled to be admitted" into the country.

61. Respondents take the position that Petitioner is subject to § 1225(b)(2)(A) and therefore not entitled to bond under Respondents' policies, including the BIA decision, *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 223 (BIA 2025). *See* Dkt. 12, Respondents' Response to Petition, *Negrete Bravo v. Secretary of Homeland Security*, No. 5:26-cv-01760, at *2 (C.D. Cal. Apr. 17, 2026); Exhibit 7 at 8-9 (noting Petitioner was served with a "Bautista class action notice" but stating Petitioner "will remain in ERO custody pending his immigration hearing"); *see also infra* at ¶¶ 116-121 (discussing Respondents' novel policy and noncompliance with court orders holding their policy unlawful).

62. However, § 1225(b)(2)(A) cannot govern or authorize Petitioner's detention because he is not and was not seeking entry at the border upon being detained. *See, e.g.*, *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160, 1164-65 (9th Cir.

2026); *Maldonado Bautista v. Santacruz*, 813 F. Supp. 3d 1084, 1102 (C.D. Cal. 2025); *see also infra* at ¶¶ 116-121.

63. This leaves § 1226(a). However, as explained below, Petitioner's present detention cannot be authorized by that statutory provision. "[S]ection 1226(a) and its implementing regulations provide extensive procedural protections." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1202 (9th Cir. 2022). A foundation of these protections is an "initial custody determination" by DHS officers. *Id.*; 8 C.F.R. § 1236.1(c)(8). This initial custody determination is a "requirement that ICE engage in a deliberative process prior to, or contemporaneous with, the initial decision to strip" a noncitizen of his freedom. *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 497 (S.D.N.Y. 2025). "DHS utilizes a Notice of Initial Custody Determination, Form I-286, to document its custody determinations." *Veliz-Pina v. Semaia*, 2026 WL 3012453, at *4 (C.D. Cal. Oct. 6, 2026) (citing 8 C.F.R. § 236.1(g)). Critically, the "Form I-286 includes 'the formal mechanism—a box the detainee may check—to immediately request' that an Immigration Judge ("IJ") review DHS's custody determination at a custody redetermination hearing (i.e., a bond hearing)." *Id.* (citing *Garcia-Maya v. Blanche*, No. 2026 WL 1965886, at *8 (D. Nev. July 7, 2026)); *see also* 8 C.F.R. § 1003.19.

64. Here, Petitioner did not receive that process because they treated and continue to treat him as an individual detained under § 1225. Because Respondents did not satisfy the requirements for detention under §1226(a), that statute cannot authorize Petitioner's detention. *See, e.g.*, *Evangelista v. Semaia*, No. 5:26-cv-04787-BFM, 2026 U.S. Dist. LEXIS 207467, at *7 (C.D. Cal. Sep. 8, 2026) (finding "utter lack of compliance with § 1226(a)" where there was "no initial finding that [Petitioner] was a flight risk or a danger—no initial determination, and no redetermination by an IJ at the outset of the proceeding" (collecting cases)); *Veliz-Pina v. Semaia*, 2026 WL 3012453, at *8 (same); *id.* at *7 ("In the absence of an initial custody determination, which establishes a lawful basis for detention in the first instance, a subsequent bond hearing

'is no substitute for the requirement that ICE engage in a deliberative process prior to, or contemporaneous with, the initial decision to strip' Petitioner of his freedom.").

65. "Where the record shows Respondents have not identified a valid statutory basis for detention in the first place, the remedy is not to supply one through further proceedings." *Yociris P. v. Bondi*, 2026 WL 327937, at *3 (D. Minn. Feb. 8, 2026). The remedy is release. *See, e.g.*, *id.*; *Dominguez*, 2026 WL 2574835, at *3; *Navarro v. Warden, Cent. Valley Annex Det. Facility*, 2026 WL 2294963, at *2 (E.D. Cal. Aug. 10, 2026); *accord Munaf v. Geren*, 553 U.S. 674, 693 (2008) (emphasizing that "[h]abeas is at its core a remedy for unlawful executive detention," and "[t]he typical remedy for such detention is, of course, release"); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020) ("Habeas has traditionally been a means to secure release from unlawful detention."). Moreover, Respondents continue to adopt their expansive interpretation of § 1225(b)(2)(A) that courts have held is unlawful. Courts have, in such cases, recognized the petitioner's detention is unlawful and warrants release. *See, e.g.*, *Jaime v. Janecka*, No. 5:26-cv-04181-MBK, 2026 U.S. Dist. LEXIS 177230, at *10 (C.D. Cal. Aug. 7, 2026) (citing *Perez v. Acting Warden of the Adelanto Det. Ctr.*, 2026 U.S. Dist. LEXIS 169992, at *15–16 (C.D. Cal. July 30, 2026) (collecting cases)); *Veliz-Pina v. Semaia*, 2026 WL 3012453, at *8; *supra* at ¶¶ 22-23, 26; *infra* at ¶¶ 116-121.

## II. The bond proceedings before the Immigration Judge were legally deficient and provide independent grounds for release.

66. The IJ's denial of bond on July 24, 2026 provides an additional basis for granting a writ of habeas corpus and ordering release.

67. The Court has jurisdiction to review the IJ's denial of bond. Under Ninth Circuit precedent, the Court has jurisdiction to review the IJ's bond decision to address legal issues, including constitutional questions and mixed questions of law. *See Martinez v. Clark*, 124 F.4th 775, 783 (9th Cir. 2024). An IJ's flight risk determination is reviewable as a mixed question of law. *See Wilkinson v. Garland*, 601 U.S. 209, 221

(2024); *accord Miri v. Bondi*, No. 5:26-CV-00698-MEMF-MAR, 2026 WL 622302, at *5-7 (C.D. Cal. Mar. 5, 2026); *Villa v. Mullin*, No. 5:26-CV-01690-JDE, 2026 WL 1583941, at *2 (C.D. Cal. June 2, 2026). The IJ also is required to follow EOIR regulations, BIA precedent, and EOIR policies. *See Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); 8 C.F.R. § 1003.1(g). Failure to do so constitutes an abuse of discretion.

68. Moreover, "[d]istrict courts have the authority to review compliance with prior orders granting habeas relief, including orders for bond hearings." *Bayani v. LaRose*, No. 26-CV-266-JESVET, 2026 WL 1270059, at *3 (S.D. Cal. May 8, 2026) (citing *Leonardo v. Crawford*, 646 F.3d 1157, 1161 (9th Cir. 2011)).

69. The IJ is required to follow EOIR regulations and BIA precedent. *See Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); 8 C.F.R. § 1003.1(g) ("decisions of the Board and decisions of the Attorney General are binding on all officers and employees of DHS or immigration judges in the administration of the immigration laws of the United States.").

70. Here, the proceedings before the IJ violated Petitioner's rights under due process and constituted an abuse of discretion for several reasons:

**A. The Immigration Judge failed to consider alternatives to detention.**

71. The *Rodriguez* injunction demands that the IJ consider alternatives to detention in order to comply with due process requirements. *See Rodriguez*, 2013 WL 5229795 at *2; *Rodriguez III*, 804 F.3d at 1074. The effectiveness of alternatives to detention in the immigration context is well-established. *See, e.g. Hernandez*, 872 F.3d at 991 (recognizing that ISAP "resulted in a 99% attendance rate at all Executive Office of Immigration Review hearings and a 95% attendance rate at final hearings"). Participants in these programs appeared at 98% of final hearings (Petitioner's final hearing is scheduled for the near future in October), and 91.1% of total hearings. *See* ICE, Detention Management, Detention FY 2026 YTD, Alternatives to Detention FY

2026 YTD and Facilities FY 2026 YTD, Footnotes, https://www.ice.gov/detain/detention-management#stats (last visited September 12, 2026). Fiscal year 2025 data shows similar results with participants in these programs attending 98.2% of total hearings. *Id.*, Detention FY 2025 YTD, Alternatives to Detention FY 2025 YTD and Facilities FY 2025 YTD, Footnotes, https://www.ice.gov/detain/detention-management#stats.

72. But, here, the IJ failed to consider any alternatives to detention. *See Cantor v. Freden*, 761 F. Supp. 3d 630, 638-640 (W.D.N.Y. 2025) (holding that in determining whether petitioner poses a flight risk, the IJ must consider whether that risk may be mitigated by reasonable conditions of supervision or monetary bond); *Mendoza v. Noem*, No. 26-CV-1260 (LJL), 2026 WL 1470652, at *6 (S.D.N.Y. May 26, 2026) ("[T]he IJ must meaningfully consider alternatives to detention and Petitioner's ability to pay a bond.); *Davis v. Garland*, No.22-CV-443-LJV, 2023 WL 1793575, at *6 (W.D.N.Y. Feb. 7, 2023) (stating an immigration judge who does not even consider conditional release may wrongfully detain certain noncitizens who may otherwise be safely released).

73. A "well-established body of caselaw" demonstrates that the IJ's perfunctory reference to "conditions," as here, "without any explanation or elaboration," falls short of considering alternatives to detention and violates due process. *Mendoza,* 2026 WL 1470652, at *5-6 (discussing decisions and collecting cases). Petitioner affirmatively offered alternatives and stated that he was "ready to comply with any conditions" of release. Exhibit 6 at 17-19. The IJ, however, "did not discuss those alternatives or explain why they were insufficient." *Mendoza*, 2026 WL 1470652, at *6 (holding IJ failed to consider alternatives to detention based on similar record); *see also, e.g.*, *Alvarez Felix v. United States Dep't of Just.*, No. 2:26-CV-03304-HDV-AYP, 2026 WL 1719418, at *2 (C.D. Cal. June 10, 2026) (holding that bond hearing failed to comply with due process where IJ made similar conclusory statement but "did not engage in any meaningful analysis of potential alternatives to

detention, such as a GPS ankle monitor, home detention, enrollment in [ISAP], or other reporting requirements as part of the flight risk calculus"); *id.* (stating "courts around the country have found due process violations on similar facts" and collecting cases); *R.R.M.C. v. Decker*, No. 22 CIV. 2952 (LGS), 2022 WL 4639674, at *5 (S.D.N.Y. Sept. 30, 2022) (holding IJ failed to meaningfully consider alternatives to detention where decision only stated in conclusory terms that alternatives would not mitigate flight risk but "did not mention any specific alternatives or explain why any are insufficient"); *Quituizaca v. Barr*, No. 20-CV-403-LJV, 2021 WL 6797494, at *7 (W.D.N.Y. Jan. 5, 2021) (similar).

74. The IJ's failure to consider alternatives to detention constitutes an application of the wrong legal standard, denial of due process, and abuse of discretion.

### B. The IJ abused her discretion by relying on Petitioner's unlawful status.

75. The IJ abused her discretion and violated due process by relying on Petitioner's unlawful entry. "To consider this fact violates both § 1226(a)'s requirement of an individualized hearing and fundamental due process principles." *Villa v. Mullin*, --- F. Supp. 3d ----, No. 5:26-CV-01690-JDE, 2026 WL 1583941, at *2 (C.D. Cal. June 2, 2026) (quoting *Lemus Crispin v. Bondi*, 832 F. Supp. 3d 534, 544 (E.D. Va. 2026) and collecting cases). Reliance on entry without inspection would render "'discretionary detention under § 1226(a)" into "a de facto mandatory § 1225 detention'" regime. *Lemus Crispin*, 832 F. Supp. 3d at 544. Indeed, the IJ's decision cannot be squared with the overwhelming authority, including a recent Ninth Circuit opinion, confirming that noncitizens who entered without inspection are eligible for bond and not subject to mandatory detention under § 1225(b)(2)(A). *See Rodriguez Vazquez v. Bostock*, 183 F.4th 1160, 1164-65 (9th Cir. 2026).

76. Moreover, the IJ "failed to identify why conduct that occurred approximately 2[0] years ago (or more) suggests Petitioner would be motivated to flee and otherwise not appear at future immigration proceedings." *Soriano v. Hernandez*,

830 F. Supp. 3d 1071, 1081 (W.D. Wash. 2026). Petitioner has shown a stable residence and employment over the last 20 years, has no criminal history or history of non-appearance, and has four United States citizen children, as well as his wife, who are dependent on him. *See* Exhibits 5-6. "The IJ provides no explanation why an unauthorized reentry into the United States [20] years ago would motivate Petitioner to uproot his family from his community (or abandon his family) to avoid immigration officials and flee." *Soriano*, 830 F. Supp. 3d at 1081. Such a decision "automatically weighs in favor of finding flight risk lacks any objective rationale." *Id.*; *accord, e.g.*, *Santiago Morales v. Mullin,* No. 5:26-CV-04576-CTS, 2026 WL 2678274, at *6 (C.D. Cal. Sept. 11, 2026) ("A decades-old history of simply entering the United States without permission, or trying to, has been held to be 'legally insufficient to establish a current flight risk that is unmanageable by release on bond.'" (citation omitted)).

**C. The IJ's determination that Petitioner was a flight risk based on not paying taxes for two years is also an abuse of discretion.**

77. The IJ also stated that Petitioner "admitted to not paying taxes for the last two years," concluding that this demonstrated a disregard for "immigration laws." IJ Decision at 1.

78. First, as courts have held, an IJ "abuses their discretion in determining that a noncitizen is a flight risk based on their failure to file tax returns." *Pedro v. Mullin*, No. 5:26-CV-04303-MBK, 2026 WL 2677303, at *7 (C.D. Cal. Sept. 11, 2026) (citing *Perez Velasquez v. Bondi*, No. 26-CV-01759-GPC-DDL, 2026 WL 1042479, at *6 (S.D. Cal. Apr. 16, 2026)); *Chavarria Mejia v. Crawford*, No. 1:26-CV-253 (LMB/LRV), 2026 WL 819603, at *6 (E.D. Va. Mar. 25, 2026) ("The failure to pay taxes, standing alone, 'does not provide the evidentiary support constitutionally required to deny a noncitizen's request for release on bond, particularly given that the Immigration Judge did not consider any condition or set of conditions that will reasonably ensure [petitioner's] appearance at future proceedings.'" (quoting *Lemus Crispin*, 832 F. Supp. 3d at 545)).

79. Second, the IJ's misstated the record and ignored probative evidence in finding that Petitioner admitted to "not paying taxes for the last two years." IJ Decision at 1. Petitioner admitted to not *filing* his taxes for the years 2024 and 2025. He provided an explanation for this delay and, of course, he was detained in January of 2026 before he had the opportunity to file his 2025 tax return. More to the point, however, he did not state nor did any evidence show he did not pay taxes for those years. Petitioner submitted unrebutted evidence that he filed his taxes for nearly all of the past twenty-one years, 2005 and 2007 through 2023. Exhibit 5 at 29-65. Notably, Petitioner received a *refund* when he filed all of those tax returns. *See id.* The fact that Petitioner did not file his tax returns for 2024 and 2025 does not constitute a failure to pay his taxes; to the contrary, it indicates that he has paid those taxes but has simply yet to seek his refund.

80. Lastly, the IJ found this behavior to show "a disregard of immigration laws." IJ Decision at 1. However, the IJ failed to explain how a delay in filing a tax return is indicative of disregarding any *immigration* law, much less how it evidences flight risk. At bottom, the IJ's rationale is divorced from any reasoning supporting flight risk.

81. Courts have found that, as here, an "IJ's failure to consider or apply any of the *Guerra* factors and decision to instead rely on ... evidence that 'bear little if any relevance' to Petitioner's risk of flight, while seemingly ignoring all evidence in Petitioner's favor constitutes a misapplication of the legal standard to the facts." *Perez Velasquez v. Bondi*, No. 26-cv-01759-GPC-DDL, 2026 WL 1042479, at *6 (S.D. Cal. Apr. 16, 2026).

**D. The IJ legally erred and violated due process by relying on the fabricated Form I-213.**

82. The *Rodriguez* injunction squarely places the burden of proof on the government. DHS's only evidence was a Form I-213 that was backdated, unauthenticated, and unreliable. *See* Exhibit 7 at 5-9. The Ninth Circuit has held that a

Form I-213 is insufficient to satisfy the burden of proving a disputed issue by clear and convincing evidence. *See Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 679-80 (9th Cir. 2005). Other courts have ruled that Forms I-213 are insufficient evidence or unreliable. *See, e.g.*, *Andres A.B. v. Warden of Cal. City Det. Facility*, 2026 U.S. Dist. LEXIS 200818, at *11 (E.D. Cal. Sep. 2, 2026) (finding Form I-213 insufficient to support government's assertion); *Ortuna Reina v. DHS/OPLA*, 2026 WL 2253328, at *1 (C.D. Cal. Aug. 3, 2026) ("The I-213 record and its I-831 continuation bear marks of at best careless, at worst unreliable, preparation."); *Sanchez Henao v. Hernandez*, 2026 WL 1492714, at *6 (W.D. Wash. May 28, 2026) (discrediting uncorroborated I-213 and noting deficiencies that made "the accuracy of the form [] suspect"); *Vargas Ramirez v. United States*, 93 F. Supp. 3d 1207, 1216 (W.D. Wash. 2015) (discussing undisputed inaccuracies in Form I-213); *accord Picado v. Hyde*, No. 26-CV-065-JJM-PAS, 2026 WL 352691, at *7 (D.R.I. Feb. 9, 2026) ("Without more, an uncorroborated police report is simply not clear and convincing evidence sufficient for a finding of dangerousness.").

83. The Second Form I-213 was also unauthenticated, *see* Fed. R. Evid. 901; Fed. R. Evid. 902, contains hearsay and hearsay within hearsay, *see* Fed. R. Evid. 802; Fed. R. Evid. 805, and contains statements for which the preparing officer clearly lacked personal knowledge. *See* Fed. R. Evid. 602; *see also Smith v. Garland*, 103 F.4th 663, 667 (9th Cir. 2024) (clarifying that evidence in immigration court must be authenticated).

84. Moreover, the backdated Form I-213 contained obvious signs of untrustworthiness. The Second Form I-213 claims to have been prepared on December 23, 2025. *See* Exhibit 7 at 5. However, ICE previously prepared a Form I-213 that was signed on January 7, 2026. *See* Exhibit 8. That First Form I-213 states that it was prepared by Deportation Officer Perez and that the "examining officer" was Officer J. Grande. *Id.* at 1. This First Form I-213 was signed by both officers. *Id.* The Second Form I-213 also claims Officer J. Grande was the examining, or interviewing, officer

and that the interview took place on December 23, 2025. *Id.* at 5. However, the First Form I-213 states that Officer J. Grande conducted the interview two weeks later: on January 7, 2026. Exhibit 8 at 1. The Second Form I-213, unlike the First Form I-213, was not signed by any officer. *Id.* at 5-9.

85. The Second Form I-213 was plainly *not* prepared on December 23, 2025, because the form itself points to dates that occurred *after* December 23, 2025. The Second Form I-213 refers to records checks that were completed on February 10, 2026, and states that "[o]n February 24, 2026, [Petitioner] was served with the Baustista Class Action Notice…." Exhibit 7 at 9. While it is plain that the Second Form I-213 was not prepared on December 23, 2025, and that is post-dated the First Form I-213 (as it refers to events in February 2026), it is unclear when the Second Form I-213 was created.

86. In addition to these procedural and foundational discrepancies, there are several substantive discrepancies that further undermine the authenticity and reliability of the Second Form I-213 (and, as a consequence, both Forms I-213).

87. Most critically, the Second Form I-213 includes new information regarding Petitioner's arrest that was not in the First Form I-213. The First Form I-213 claimed ICE "ERO identified themselves and requested identification," but the Second Form I-213 claimed "DO's [sic] and Customs and Border Protection (CBPO), wearing tactical gear with approved 'POLICE' and 'ICE' and 'CBP' identifiers, informed the subject that they were investigating and requested his identification and name." *Compare* Exhibit 8 at 2, *with* Exhibit 7 at 7. Critically, the IJ relied on this novel allegation in her decision denying bond. IJ Decision at 1.

88. The Second Form I-213 also claims that officers followed Petitioner, "initiated a stop," "informed the subject that they were investigating and requested his identification and name," and Petitioner then "attempted to evade and ran into the local business El Super Toro Loco." Exhibit 6 at 7. This is contradicted by HSI Agent Tomaselli's affidavit, filed on December 23, 2025, which attests that "before CBPO Haukom and Cosey were able to speak with Negrete, Negrete fled inside the El Super

Toro Loco 4." Dkt. 1, *United States v. Negrete Bravo*, 5:25-mj-00786, at *3 (C.D. Cal. Dec. 23, 2025).

89. As noted, the Second Form I-213 was prepared by Deportation Officer Flores, whereas the First Form I-213 was by Deportation Officer Perez. However, both officers state in the respective Forms I-213: "During the attempt to gain compliance, I heard CBPO Haukom state…." Exhibit 8 at 2; Exhibit 7 at 6. The fact that Officer Flores was "assigned this case for processing at the San Bernardino Office" suggests he was not present at the arrest. Exhibit 7 at 8. However, because the record does not demonstrate which ICE officers were present at the time of arrest, the multi-layered hearsay statement that a speaker "heard CBPO Haukom" during the arrest cannot be attributed to any speaker and is thus inadmissible and unreliable.

90. The Second Form I-213 also presents novel information, not in the First Form I-213, claiming that upon arrival to "the designated meeting site with contractors," "CBPO Haukom and CBPO Cosey informed us that Negrete Bravo had bitten both of them." Exhibit 7 at 7. Notably absent from the Second Form I-213, however, are the facts that the federal government declined to prosecute Petitioner for these allegations, moved to dismiss the 18 U.S.C. § 111 charge, and requested that Petitioner be released from custody. *See* Dkt. 11-1, *Negrete-Bravo*, 5:25-mj-00786 (C.D. Cal. 2025); *id.*, Dkt. 13. In fact, the Second Form I-213 completely omits the transfer from the U.S. Marshal's custody in January 2026 and represents that Petitioner was in ICE custody the entire time.

91. The Second Form I-213 also claims that Petitioner was interviewed and answered a series of questions before he was transported to the San Bernardino ICE Field Office for processing. *See* Exhibit 6 at 7-8. It also claims "DO ORTIZ contacted LESC over the phone, and LESC stated that [Petitioner] had no status in the United States." *Id.* However, this is undermined by the First Form I-213 which does not mention these events. *See* Exhibit 8. Moreover, the Second Form I-213 is contradicted by the affidavit signed on December 23, 2025 that attests Petitioner invoked his

constitutional rights, declined to answer questions, and requested legal counsel. *See* Dkt. 1, *United States v. Negrete Bravo*, 5:25-mj-00786, at *5-6 (C.D. Cal. Dec. 23, 2025).

92. There are several more discrepancies with the Second Form I-213. For example, the Second Form I-213 replaces Petitioner's residential address with the ICE Field Office in San Bernardino. *Compare* Exhibit 8 at 1, *with* Exhibit 7 at 6. The Second Form I-213 reports the date of apprehension as December 23, 2025 at 10:56AM by an Officer Ortiz, although the First Form I-213 reported those facts as January 7, 2026, at 10:00AM by Officer Romo. Whereas the First Form I-213 stated the arrest occurred at 3470 12th Street, Riverside, CA 92501, a federal courthouse, the Second Form I-213 replaces that with "2nd and Coahuila, , [sic] Mecca, California, United States." The Second Form I-213 also reports a different date of birth for the Petitioner. *Compare* Exhibit 8 at 2, *with* Exhibit 7 at 7.

93. For these reasons, the IJ legally erred in relying on the Second Form I-213. Moreover, if DHS wanted to rely on the statements of the officers in the I-213, DHS was required to provide those officers for cross-examination. *See* 8 U.S.C. § 1229a(b)(4)(B) (right to cross-examine witnesses presented by the government); *Alcaraz-Enriquez v. Garland*, 19 F.4th 1224, 1231 (9th Cir. 2021) (failure to procure witnesses whose testimony was embodied in report and which agency relied upon was legal error).

**E. The IJ failed to hold DHS to its burden of proving Petitioner's detention is justified by clear and convincing evidence.**

94. The IJ failed to place the burden of proof on DHS, much less to prove that Petitioner's detention is justified by clear and convincing evidence. As a threshold matter, the IJ's decision characterized the hearing as a "custody redetermination pursuant to 8 C.F.R. § 1236," IJ Decision at 1, the regulatory framework implementing § 1226(a). Under § 1226(a), unlike the *Rodriguez* constitutional framework, the burden of proof is on the noncitizen. This indicates that the IJ placed the burden of proof on

Petitioner instead of DHS. *See, e.g.*, *Espada Hernandez v. Warden of Adelanto ICE Processing Ctr.*, No. 5:26-CV-02231-AJR, 2026 WL 1362396, at *6 (C.D. Cal. May 11, 2026).

95. As courts have held, "the IJ's mere recitation of the applicable legal standard is not enough when the IJ's decision makes it clear . . . that the IJ did not actually apply the standard in his reasoning and decision." *Ramos-Portillo v. McAleenan*, No. EDCV180260MWFSS, 2019 WL 3246499, at *1 (C.D. Cal. July 19, 2019). "It is the application of the clear-and-convincing standard, not its recitation, that matters." *Id. see also Ramirez*, 2026 WL 2395217, at *9 ("[I]t is clear that that the Immigration Judge was only giving lip service to Respondents' "clear and convincing evidence" burden of proof."); *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1135 (9th Cir. 2016) ("An agency acts contrary to the law when it gives mere lip service or verbal commendation of a standard but then fails to abide the standard in its reasoning and decision.").

96. The record also demonstrated the IJ failed to hold DHS to its "high burden" of proving *by clear and convincing evidence* that Petitioner's detention is justified. *Ramirez v. Blanche*, No. 5:26-CV-03938-DTB, 2026 WL 2395217, at *8 (C.D. Cal. Aug. 17, 2026) (citing *Obregon v. Sessions*, Case No. 17-cv-01463-WHO, 2017 WL 1407889, at *6 (N.D. Cal. Apr. 20, 2017)). The government "must present sufficient evidence to produce 'in the ultimate factfinder an abiding conviction that the truth of its factual contention are highly probable." *Id.* (cleaned up) (quoting *Sophanthavong v. Palmateer*, 378 F.3d 859, 866 (9th Cir. 2004)). The IJ heavily relied on the Form I-213 that, as explained above, the IJ legally erred in considering at all. As a consequence, the IJ did not hold DHS to its heavy burden.

**F. The IJ abused her discretion and violated due process because she relied on allegations of conduct for which the federal government dismissed the charge.**

97. The IJ relied on the unreliable statements from the Second Form I-213, stating the record "reflects that he bit law enforcement officials." IJ Decision at 1. The IJ also discredited Petitioner's testimony that he did not know the officers were law enforcement by relying on the same Second Form I-213. *Id.* As discussed above, the IJ's reliance on the Second Form I-213 was an abuse of discretion and violated due process. The IJ's reliance on these statements further constitutes an abuse of discretion and denial of due process because the allegations related to a criminal charge where the federal government dismissed the sole charge. The federal government also, in doing so, requested that Petitioner be released from custody. The federal court both dismissed the charge and ordered Petitioner's release. *See* Dkt. 11-1, *Negrete-Bravo*, 5:25-mj-00786 (C.D. Cal. 2025); *id.*, Dkt. 13.

98. Under BIA precedent, the IJ may only consider evidence of pending criminal charges and if the evidence is "probative and specific." *Matter of Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006); *accord Matter of Siniauskas*, 27 I. & N. Dec. 207, 209 (BIA 2018) (relying on a criminal offense where the respondent did not dispute that he was recently arrested and the charges were still pending); *Matter of Salas Pena*, 29 I. & N. Dec. 173, 174 (BIA 2025) (emphasizing that the charge relied upon "remains pending"). Thus, the IJ abused her discretion by relying on allegations where the government had declined to prosecute, and any evidence was thus not probative of any criminal conduct. *See, e.g.*, *Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993, 1005 (N.D. Cal. 2018) (holding the IJ violated due process when the IJ relied on a single arrest that was not supported by "probative and specific" evidence). DHS's evidence in this case was not sufficient because of the foundational errors with the Second Form I-213. But, independent and in addition to that foundational deficiency, the allegations regarding Petitioner's conduct during his arrest were improper to rely on because there

is no pending criminal charge and the complaint was dismissed on the government's motion.

99. In fact, the Office of the United States Attorney's dismissal of the criminal complaint demonstrates that there was insufficient evidence to prove the allegations. Rather than presenting the case to a grand jury (or to a magistrate judge pursuant to a preliminary hearing), the government dismissed the complaint and asked the magistrate judge to order Petitioner's immediate release from custody. As a result, no part of the complaint was ever subject to review by a neutral party (the grand jury or a neutral court officer) prior to its dismissal. The allegations are therefore improper to rely on and doing so resulted in the denial of due process and an abuse of discretion.

**G. The IJ misstated the record and ignored relevant evidence, constituting a further abuse of discretion and denial of due process.**

100. Where the IJ "fail[s] to mention highly probative or potentially dispositive evidence," or "misstates the record," the IJ has committed legal error. *Cole v. Holder*, 659 F.3d 762, 771-72 (9th Cir. 2011). Here, the IJ failed to consider several salient aspects of the record. As discussed above, the IJ also failed to consider that the criminal allegations regarding Petitioner's conduct during his arrest had been dismissed by the government. The IJ further failed to consider the fact that the arrest was indisputably a result of mistaken identity, and that the officers were in plainclothes and not identifiable as law enforcement officers. *See* Exhibit 6 at 7-8, 13-14.

101. The IJ further failed to consider the highly probative evidence Petitioner submitted demonstrating his significant ties to the community, stable residence, stable work history, long history and filing and paying his taxes, and strong incentives in appearing for his removal proceedings. *See* Exhibit 5; Exhibit 6; *Y.S.G. v. Andrews*, No. 2:25-CV-1884-SCR, 2025 WL 2979309, at *11 (E.D. Cal. Oct. 22, 2025) (citing *Cole*, 659 F.3d at 771)). The IJ's failure to consider relevant evidence in several respects was an abuse of discretion and denied Petitioner due process. *See also Nam Ko v. Mullin*,

No. 5:26-CV-02020-KS, 2026 WL 1454208, at *6 (C.D. Cal. May 22, 2026) ("'The IJ's misapplication of the legal standard also bears on Petitioner's due process rights," which require that the IJ consider relevant evidence." (quoting *Velasquez v. Bondi*, No. 26-cv-01759-GPC-DDL, 2026 U.S. Dist. LEXIS 85165 at *16, 2026 WL 1042479 (S.D. Cal. Apr. 16, 2026)).

**H. Petitioner was and will continue to be denied a neutral arbiter.**

102. "A neutral judge is one of the most basic due process protections." *Reyes-Melendez v. INS*, 342 F.3d 1001, 1006 (9th Cir. 2003). Due process ensures "the guarantee of an impartial and disinterested tribunal." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). "[A]n immigration judge has a responsibility to function as a neutral, impartial arbiter and must be careful to refrain from assuming the role of advocate for either party." *Islam v. Gonzales*, 469 F.3d 53, 55 (2d Cir. 2006).

103. The IJ's bias in this case is demonstrative of the systematic reconstruction of EOIR into an enforcement arm of the current administration's enforcement agenda. As courts have observed, "judges need not 'shut [their] eyes to matters of public notoriety and general cognizance. When [they] take [their] seats on the bench [they] are not struck with blindness, and forbidden to know as judges what [they] see" as ordinary members of society.'" *Zheng v. Rokosky*, 826 F. Supp. 3d 545, 559 (D.N.J. 2026) (quoting *Ho Ah Kow v. Nunan*, 12 F. Cas. 252, 255 (C.C.D. Cal. 1879).

104. These circumstances have made immigration courts structurally incapable of providing the neutral tribunal and individualized assessment that due process requires. *See, e.g.*, *Avilez Aguinaga v. Warden, Joe Corley Processing Ctr.*, No. CV 4:26-0137, 2026 WL 266510, at *1-2 (S.D. Tex. Feb. 2, 2026) (ordering immediate release rather than a bond hearing after acknowledging the argument that "immigration courts have been systematically transformed and are no longer capable of providing an impartial tribunal and individualized assessment"); *Qazi v. Albarran*, No. 2:25-CV-02791-TLN-CSK, 2025 WL 3033713, at *6 (E.D. Cal. Oct. 10, 2025) ("Based on Petitioner's request, the Court orders the hearing to occur before a neutral adjudicator.

However, the Court expresses serious doubt as to whether the use of Immigration Officers to make factual findings and determinations comports with due process.") (citation omitted); *Briceno Solano v. Mason*, No. 2:26-CV-00045, 2026 WL 311624, at *20 (S.D.W. Va. Feb. 4, 2026) (ordering immediate release of re-detained petitioner initially released by DHS on own recognizance, and finding "there is no chance any [bond] hearing that occurred would comport with due process."); *Umarov v. Mason*, No. 2:26-CV-00081, 2026 WL 381614, at *8 (S.D.W. Va. Feb. 11, 2026) (same).

105. The mounting evidence that bond determination hearings conducted in immigration court have "preordained outcomes has become impossible to ignore." *Singh v. Valdez*, No. 26-CV-1109-WJM, 2026 WL 890240, at *5 (D. Colo. Apr. 1, 2026). "Respondents' conduct can no longer be attributed to mere negligence or ineptitude . . . and doing so would effectively allow the Government to transform an unlawful detention into a lawful one through post-hoc justifications." *Zheng*, 826 F. Supp. 3d at 564.

106. One former Immigration Judge put it plainly: "I can tell you that today, the immigration courts are substantively dead. They are completely absent of due process. Of fair hearings … If you're concerned about doing due process of fair hearings, they're gone. So we can start from that position."[10] Another former senior EOIR official and military judge similarly stated, "I don't think the immigration-court system is a court system . . . What this Administration wants is a rubber stamp."[11]

107. District Courts around the country have recognized that immigration judges are failing to provide due process, even where federal courts order a bond hearing pursuant to habeas relief. *See, e.g.*, *Singh*, 2026 WL 890240, at *5; *Zheng*, 826

---

[10] Balko, Radley, "'The courts are dead, "An Interview with an Immigration Judge," The Watch (Jan. 8, 2026), https://radleybalko.substack.com/p/the-courts-are-dead-an-interview

[11] Kim, Tammy E., "Inside Donald Trump's Attack on Immigration Courts," The New Yorker (Oct. 23, 2025), https://www.newyorker.com/inside-donald-trumps-attack-on-immigration-court.

F. Supp. 3d at 560 (holding that immigration court bond hearing was "the exact 'rubber-stamp' process that due process forbids"); *Montero-Martinez v. Mattos*, 2026 WL 674497, at *1-2 (D. Nev. Mar. 9, 2026) (bond was revoked by IJ based on materially false information); *Garcia Ortiz v. Henkey*, No. 1:26-CV-00043-BLW, 2026 U.S. Dist. LEXIS 78932, 2026 WL 948275, at *4 (D. Idaho Apr. 7, 2026) (noting evidence that "Immigration Judges across the country are systemically denying bond to [noncitizen] detainees, regardless of the weight of the evidence.").[12]

108. IJs and BIA members are career attorneys within the DOJ who ultimately report to the Attorney General, an appointee of the executive branch. This makes IJs and BIA members "very susceptible to pressure from above to decide cases in a certain way." Karen Musalo et. al., *With Fear, Favor, and Flawed Analysis: Decision-Making in U.S. Immigration Courts*, 65 B.C. L. Rev. 2743, 2755 (2024).

109. The evidence that EOIR has transformed into an enforcement arm of DHS is evident through (1) the mass-scale purge of IJs perceived as obstacles to the administration's enforcement agenda, and their replacement by administration loyalists; (2) the parallel purge of BIA members, yielding a 97% pro-government decision rate; and (3) EOIR policy directives establishing expectations that adjudications favor the government over noncitizens, including when doing so defies federal court orders. Particularly when taken together, this evidence conclusively demonstrates the systematic destruction of EOIR's ability to neutrally adjudicate cases, particularly those related to detention.

110. Since the current presidential administration took office in January 2025, it has fired IJs en masse, "many seemingly because their judicial philosophies did not

---

[12] *See also* Kyle Cheney, *Judges Keep Ordering Immigration Hearings — But Say the Results Are Often a Sham*, POLITICO (Mar. 6, 2026), https://www.politico.com/news/2026/03/06/immigration-case-hearings-judges-00815660.

align with the administration's priorities."[13] The firings began with the systematic targeting of judges "who granted asylum at high rates," "who as lawyers had represented immigrants," and those who appeared on the Heritage Foundation's "DHS watchlist."[14] Former IJ Emmett Soper, who served in his position for twenty years, observed, "I think the current administration of the immigration courts does not fundamentally see the immigration courts as neutral decision-makers. I think that they see immigration courts as a tool for this administration to advance its policy objectives."[15] Former IJ Jeremiah Johnson similarly understood "the hint that they should be hearing cases a certain way, deciding cases a certain way. Move faster. Less due process, essentially."[16] Another former IJ George Pappas revealed: "We were told to facilitate deportation . . . Due process is dead in immigration courts."[17] For instance,

---

[13] Levin, Sam, "'Hell on earth': immigrants held in new California detention facility beg for help," The Guardian (Sept. 27, 2025) https://www.theguardian.com/us-news/2025/sep/27/immigrants-california-detention-facility; Nicholas Nehamas et al., "How Trump Purged Immigration Judges To Speed Up Deportations," The New York Times (Apr. 13, 2026) https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-judges-purge.html.

[14] Kim, Tammy E., "Inside Donald Trump's Attack on Immigration Courts," The New Yorker (Oct. 23, 2025)

[15] Bennett, Geoff and Ali Schmitz, "Ousted immigration judge describes deepening court backlog" PBS News Hour (Nov. 12, 2025), https://www.pbs.org/newshour/show/ousted-immigration-judge-describes-deepening-court-backlog.

[16] Hilda Gutierrez, Michael Bott & Son Vo, 'An all-out attack on immigration court:' SF immigration judges speak out after firings, NBC Bay Area (Nov. 25, 2025), https://www.nbcbayarea.com/investigations/san-francisco-immigration-judges-speak-out-firings/3986850/.

[17] Marco Poggio, "Judges See an Immigration Court Gutted from Inside," Law 360, (Oct. 31, 2025), https://www.law360.com/articles/2381003/judges-see-an-immigration-court-gutted-from-inside.

two judges who granted asylum to Palestinian students targeted by the administration were abruptly fired.[18]

111. The mass purge has created a pervasive climate of fear designed to ensure compliance with favoring the government. Former IJ Anam Petit observed: "There's a climate of fear . . . Judges feel like, if they step a toe out of line right now . . . or they're one [asylum] grant away from being fired because of the arbitrary nature of the firings."[19] Former IJ Elizabeth Young explained: "I've talked to many of [the judges still serving], and they're like, 'When I go into court, I am concerned about applying the law, but I'm also concerned that I should deny more, because if I don't, then I'll get fired.'"[20] No adjudicator can remain impartial when faced with the choice between upholding due process and keeping their position. Former IJ Carla Espinoza corroborated: "We as judges, were in fear, we were concerned . . . That makes it very difficult to be impartial."[21]

---

[18] Hamed Aleaziz, et al., Judges Fired After Blocking Deportations of Pro-Palestinian Students, The New York Times (Apr. 11, 2026) https://www.nytimes.com/2026/04/11/us/politics/immigration-judges-deportations-students.html.

[19] Eric Katz, "'Climate of Fear': Immigration Judges Say Functioning of Their Court System Is in Jeopardy Due to Trump's Firings," Gov't Executive (Nov. 14, 2025), https://www.govexec.com/management/2025/11/climate-fear-immigration-judges-say-functioning-their-court-system-jeopardy-due-trumps-firings/409544/; *see also* Isabela Dias, "'Fired for No Reason': Former Immigration Judges Speak Out Against Trump's Assault on the Courts," Mother Jones (Oct. 9, 2025), https://www.motherjones.com/politics/2025/10/immigration-court-judge-trump-assault-purge-dhs-ice/.

[20] Marco Poggio, "Judges See an Immigration Court Gutted from Inside," Law 360, (Oct. 31, 2025), https://www.law360.com/articles/2381003/judges-see-an-immigration-court-gutted-from-inside.

[21] DuBois, Maurice, "3 immigration judges speak out about their firings: 'It was arbitrary, unfair,'" CBS News (July 24, 2025), https://www.cbsnews.com/news/immigration-judges-speak-out-firings-arbitrary-unfair/.

112. Conditioning continued employment on decisions denying relief and ordering removal injects a direct personal and pecuniary interest into IJs' decision-making — a particularly egregious form of bias that disqualifies the decisionmaker. *Caperton*, 556 U.S. at 876. Due process forbids any adjudicator from deciding a matter in which they have a personal stake, *id.* at 880, and self-preservation that requires favoring one party necessarily compromises judicial independence. The mere risk that rulings will be influenced by a decisionmaker's personal and pecuniary interest in remaining employed is sufficient to undermine due process. *Id.* at 884-85.

113. The pressure to deny bond is particularly acute, reportedly because "those in custody are more likely to accept deportation."[22] EOIR's Chief Immigration Judge monitors bond rulings through daily reports and has emailed judges demanding explanations for bond grants.[23] One IJ confirmed that supervisors must be notified every time bond is granted, making the "pressure to deny bond ... overt."[24]

114. As EOIR fired IJs at scale, it filled vacant seats with adjudicators loyal to the administration's deportation agenda. On August 22, 2025, Sirce Owen, Acting Director of EOIR, released a memorandum making clear that IJs were subject to appointment and removal by the Attorney General, including those who have "different views of policy."[25] Six days later, all experiential requirements for temporary IJs were eliminated, and the Administration began working to fill those positions with military

---

[22] Nehamas, "How Trump Purged Immigration Judges To Speed Up Deportations," *The New York Times* (Apr. 13, 2026) https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-judges-purge.html.

[23] *Id.*

[24] *Id.*

[25] Executive Office for Immigration Review, Policy Memorandum 25-42, Adjudicator Independence and Impartiality, https://www.justice.gov/eoir/media/1411796/dl?inline (Aug. 22, 2025).

lawyers.[26] Corey Lewandowski, an adviser to then-DHS Secretary Noem, publicly commented on the announcement by stating, "Pete Hegseth approves 600 military lawyers as temporary immigration judges. I see more deportations of illegal immigrants in the near future"—an explicit acknowledgment of the mass deportation policy objective underlying these appointments and the erosion of institutional boundaries between DOJ and DHS.[27] The administration's campaign to hire new IJs advertises the position as "deportation judges," with DHS (the agency that prosecutes cases against immigrants before EOIR) describing it as an opportunity to "[b]ring the hammer down on criminal illegal aliens. Defend your communities, your culture, your very way of life."[28]

115. The BIA's similar transformation into an enforcement arm of the administration is also evidenced through the mass purging of its members, the statistical evidence behind its decision making, and the timing and nature of its decisions. *See supra* at ¶¶ 27-38.

116. Perhaps the clearest evidence that EOIR has abandoned neutrality is in its explicit coordination with ICE and refusal to comply with federal court orders. "Until recently, it had been the Government's longstanding position that individuals like Petitioner—who entered the United States without inspection, but were later apprehended in the interior of the country—were subject to the detention and release authority of Section 1226." *Perez v. Acting Warden of the Adelanto Det. Ctr.*, No. 5:26-cv-03936-MBK, 2026 U.S. Dist. LEXIS 169992, at *10 (C.D. Cal. July 30, 2026). But in 2025, DHS and EOIR reversed course and took the position that such individuals are

---

[26] Konstantin Toropin, Pentagon authorizes military lawyers to serve as temporary immigration judges, PBS (Sep. 2, 2025), https://www.pbs.org/newshour/nation/pentagon-authorizes-military-lawyers-to-serve-as-temporary-immigration-judges.

[27] Corey R. Lewandowski (@CLewandowski_), X (Sept. 2, 2025, 1:47 PM), https://x.com/clewandowski_/status/1962950546652070269.

[28] @DHSgov, X, (Nov. 21, 2025) https://x.com/DHSgov/status/1991887545236701694.

subject to mandatory detention under 8 U.S.C. § 1225(b)(2) instead. *Id.* at *10-11. A leaked memo from DHS demonstrated its active coordination with DOJ, who is supposed to be the neutral arbiter in cases between DHS and noncitizens, to expand mandatory detention.[29]

117. DHS and EOIR's new policies have "engendered an enormous amount of litigation in courts across the country, including the class action in *Maldonado Bautista*." *Perez*, 2026 U.S. Dist. LEXIS 169992, at *12. In December 2025, Judge Sykes issued class-wide declaratory relief that the government's new policy is unlawful, and that Bond Eligible Class Members must be subject to under § 1226(a). *Bautista v. Santacruz*, 813 F. Supp. 3d 1084, 1093-95 (C.D. Cal. 2025).

118. As Petitioner's case demonstrates, "the Government has declined to comply with the *Maldonado Bautista* final judgment since it was issued." *Perez*, 2026 U.S. Dist. LEXIS 169992, at *14; *Bautista*, 820 F. Supp. 3d at 1023 (discussing the government's systematic noncompliance). Instead, "the Government continues to arrest and detain Bond Eligible Class members like Petitioner under the putative authority of Section 1225(b), even though it recognizes that its actions are unlawful." *Perez*, 2026 U.S. Dist. LEXIS 169992, at *14. "As a result, hundreds of Bond Eligible Class members like Petitioner have been unlawfully arrested and detained in violation of their statutory and due process rights under the *Maldonado Bautista* final judgment." *Id.*

119. In January 2026, the EOIR Chief Immigration Judge directed all IJs by email to ignore District Judge Sykes' order ruling that the BIA's efforts to expand mandatory detention through its decision in *Yajure-Hurtado* was unlawful.[30] This

---

[29] Interim Guidance from U.S. Department of Homeland Security to All ICE Employees Re: "Detention Authority for Applications for Admission" (July 8, 2025), https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission.

[30] AILA, Practice Alert: EOIR Issues Nationwide Guidance on *Maldonado Bautista*, AILA Doc. No. 26011404 (Jan. 16, 2026), https://www.aila.org/library/practice-alert-eoir-issues-nationwide-guidance-on-maldonado-bautista.

policy directly contravenes federal regulations forbidding EOIR from dictating adjudicatory outcomes. *See* 8 C.F.R. § 1003.9(c) ("[t]he Chief Immigration Judge shall have no authority to direct the result of an adjudication assigned to another immigration judge").

120. Immigration judges who had complied with Judge Sykes' order reversed course after receiving the Chief Judge's directive.[31] Judge Sykes subsequently issued a decision finding that the government was engaged in "deliberate" defiance, "manufactur[ing] arguments," and was instructing IJs to rely on "interpretations that were expressly found unlawful." *Palomera Baltazar v. Janecka*, No. 5:26-cv-00019-SSS-BFM at *2-3 (C.D. Cal. Jan. 16, 2026) (Sykes, J.).

121. The evidence of institutional capture and impartiality is clear: when presented with a federal court order protecting noncitizens' rights, EOIR ordered judges to violate it. *See also* Order Adopting Report and Recommendation, *Marco M. v. Bondi*, No. 0:25-cv-04816-MJD-JFD, at 3 (D. Minn. Jan. 25, 2026) ("There has been an undeniable move by the Government in the past month to defy court orders or at least to stretch the legal process to the breaking point in an attempt to deny noncitizens their due process rights.").

122. For the reasons above, any bond proceedings with the current EOIR lack the central due process component of neutrality. As discussed, there are EOIR policies that evidence collaboration with DHS and that they have continued to enforce despite federal courts ordering otherwise. There is extreme systemic pressure on IJs to deny bond from the highest levels of EOIR, because detention serves to pressure noncitizens to self deport. Petitioner need not show that the particular IJ was or that the BIA judges assigned will be biased, it is enough that there exists a "probability of actual bias on the part of the judge or decisionmaker" too high to be "constitutionally tolerable."

---

[31] Law360, *Immigration Courts 'Ignoring' Bond Hearing Order, Judge Says* (Jan. 20, 2026), https://www.law360.com/articles/2431821/immigration-courts-ignoring-bond-hearing-order-judge-says.

*Caperton*, 556 U.S. at 872. In *Tumey v. State of Ohio*, the Supreme Court struck down a system where a judge was only paid if he convicted defendants, holding: "It certainly violates the Fourteenth Amendment and deprives a defendant ... of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him." 273 U.S. 510, 523 (1927). The current administration has created the functional equivalent by effectively conditioning continued employment on ordering removals. BIA members and IJs face termination if their decisions favor noncitizens, creating a direct pecuniary interest in denying relief, and, therefore, the executive's agency restructuring has resulted in undeniable widespread constitutional violations. Accordingly, the resulting policies and structural biases described above deprive Petitioner of due process by creating institutional bias and depriving him of meaningful review.

* * *

123. The appropriate remedy in light of the deficient bond proceedings is immediate release. *See, e.g.*, *Velasquez v. Bondi*, No. 26-CV-01759-GPC-DDL, 2026 WL 1042479, at *7 (S.D. Cal. Apr. 16, 2026); *Soriano v. Hernandez*, No. 2:26-CV-00900-DGE, 2026 WL 969764, at *6 (W.D. Wash. Apr. 10, 2026); *W.T.M. v. Bondi*, No. 2:25-CV-02428-RAJ-BAT, 2026 WL 262583, at *5 (W.D. Wash. Jan. 30, 2026); *Miri v. Bondi*, No. 5:26-CV-00698-MEMF-MAR, 2026 WL 622302, at *12 (C.D. Cal. Mar. 5, 2026); *Garcia v. Hyde*, No. 25-CV-585-JJM-PAS, --- F. Supp. 3d ----, 2025 WL 3466312, at *11 (D.R.I. Dec. 3, 2025); *Restrepo*, 2026 WL 1047688, at *7; *Espada Hernandez*, 2026 WL 1362396, at *8.

124. To the extent the Court determines that another custody hearing is the proper remedy, the Court should conduct that hearing in order to ensure it is conducted by a neutral arbiter as required by due process. *See, e.g.*, *Zheng v. Albarran*, No. 1:25-cv-01685-DJC-CKD, 2025 WL 3640676 (E.D. Cal. Dec. 16, 2025) (enjoining Respondents from re-detention "absent a showing *to the Court* that there is a change in

circumstances to warrant Petitioner's re-detention" (emphasis added)); *Leslie v. Holder*, 865 F. Supp. 2d 627, 633 (M.D. Penn. 2012); *L.G.M. v. LaRocco*, 788 F. Supp. 3d 401, 405-07 (E.D.N.Y. 2025); *Santos v. Lowe*, No. 1:18-CV-1553, 2020 WL 4530728, at *4 (M.D. Pa. Aug. 6, 2020); *Flores-Powell v. Chadbourne*, 677 F. Supp. 2d 474-78 (D. Mass 2010); *Madrane v. Hogan*, 520 F. Supp. 2d 654, 669-71 (M.D. Pa. 2007); *Ramirez v. Watkins*, No. 10-cv-126, 2010 WL 6269226, at *19-20 (S.D. Tex. Nov. 3, 2010) (recommending the habeas court conduct its own bail inquiry, as it would be more efficient, ensure supervision over any compliance issues, and avoid further proceedings); *see also Zheng v. Albarran*, No. 1:25-cv-01685-DJC-CKD, 2025 WL 3640676, at *4 (E.D. Cal. Dec. 16, 2025) (enjoining Respondents from re-detention "absent a showing to the Court that there is a change in circumstances to warrant Petitioner's re-detention" (emphasis added)); *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) ("Once a [constitutional] right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

## PRAYER FOR RELIEF

For the foregoing reasons, Petitioner respectfully requests that this Court:

1. Assume jurisdiction over this matter;
2. Declare that Petitioner's detention violates the INA;
3. Declare that the Immigration Judge's denial of bond violated due process and was an abuse of discretion;

4. Issue a writ of habeas corpus ordering Respondents to immediately release Petitioner from custody without restraints on his liberty;
5. Prohibit Respondents from re-detaining Petitioner without a hearing before a neutral decisionmaker at which the government must bear the burden of proving by clear and convincing evidence that his detention is justified;
6. Order that Respondents return any and all of Petitioner's property, including any identification documents and other possessions;
7. Grant any other and further relief that this Court deems just and proper.

Respectfully submitted,

AMY KARLIN
Interim Federal Public Defender

DATED: October 27, 2026 By *[/s/ Diana Sánchez]*

Diana Sánchez
Deputy Federal Public Defender
Attorney for Petitioner

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242 & L.R. 83-16.2**

I, Diana Sánchez, declare as follows:

1. I am an attorney with the Office of the Federal Public Defender, and I am admitted to practice law in the State of California.

2. I have been authorized to file this petition and its accompanying documents by Petitioner Humberto Negrete Bravo.

3. Because many of the allegations of this Petition require a legal knowledge not possessed by the Petitioner, I am making this verification on his behalf. Petitioner is also detained at Adelanto Detention Facility with limited access to private and confidential communications.

4. The allegations set forth herein are based on my direct communications with Petitioner and a review of relevant documents. I have reviewed the foregoing Petition for Writ of Habeas Corpus and know the contents thereof to be true and correct to the best of my knowledge.

I declare under penalty of perjury under the laws of the United States and the State of California that the contents of this petition are true and correct to the best of my knowledge and belief.

Executed October 27, 2026, at Los Angeles, California.

By */s/ Diana Sánchez*

Diana Sánchez
Deputy Federal Public Defender
Attorney for Petitioner